IN THE

# SUPREME COURT OF JUDICATURE

OF THE

# STATE OF NEW YORK,

IN OCTOBER TERM, 1836,* IN THE SIXTY-FIRST YEAR OF THE INDEPENDENCE
OF THE UNITED STATES.

---

## MILLER vs. MAXWELL.

Where a publication, in its nature *libellous*, does not on its face necessarily point to any particular individual' as the person libelled, it is necessary to the maintenance of an action by a person bringing suit on account of such publication, that he allege, by way of inducement in the introductory part of the declaration, such intrinsic facts and circumstances as that when read in connection with the libellous publication and with the *innuendoes* connecting the publication with the introductory matter, the conclusion will be inevitable in the mind of the reader that the plaintiff is the person intended to be slandered: in such case, in the language of a learned judge, "the extrinsic facts incorporated as it were into the defen_dant's publication become an integral part of the plaintiff's case, and the whole forms one entire slanderous charge upon the face of the record."

Thus in this case, where the plaintiff, in an action for a *libel*, averred by way of *innuendo* that the defendant, in attributing the authorship of a printed article to a *celebrated surgeon of whiskey memory*, or to a *noted steam doctor*, meant by these appellations him, the plaintiff, *it was held*, notwithstanding the *innuendo*, that the declaration was bad for the want of an averment, in the introductory part thereof, that the plaintiff was generally known by

---

* The few cases which follow as of October term, are those remaining of that term, not published in the last volume.

these appellatives, or that the defendant was in the habit of applying to him those opprobrious epithets.

Where the defects in a declaration are of such a character as that a verdict will not cure them, the defendant, on demurrer to a special plea, may attack the declaration, notwithstanding that the *general issue* was pleaded with the special plea.

THIS is an action for a *libel*. The plaintiff, in the introductory part of the first count of his declaration, states that on the first day of October, 1833, an article was published in a newspaper, over the signature of M. B., containing strictures upon the physicians of this country for adopting the theory of an European physician, ascribing nearly all the diseases to which mankind are subject to *spinal* irritation or inflammation ; and that the defendant untruly alleged and declared that the plaintiff was the writer of such article, and then, after other introductory matter which will directly be adverted to, the plaintiff charges the defendant with publishing a libel of and concerning him in his character of a physician and surgeon in these words : " We were lately amused by reading an article in the Herald of the 1st inst. signed ' M. B.' containing some curious remarks on many of the physicians of this country. At first we supposed it was written by a *celebrated surgeon* of whiskey memory ; but on our second perusal we changed our opinion, and concluded it was from the pen of a noted ' steam doctor.' Had the learned writer confined himself within the limits of his own knowledge, and shown a proper regard to truth, we should not have troubled ourselves nor the public with the following critique. There is a certain species of great men who will sometimes soar above their own level, until a mental lethargy seizes their brain, and they sink to a point little short of stupidity itself. If this was our learned writer's misfortune, he is entitled to a share of our kindest feelings ; but in the mean time we think it expedient to administer such remedies as will be most likely to restore his mind to its former vigor. The pompous style of the first paragraph of the article alluded to, seems to promise the reader an intellectual feast on the improvement of the sciences, and the ' injuries' which the ' world' has received from false theories and extravagant speculations. In his

ALBANY,
Oct. 1836.

Miller
v.
Maxwell.

second paragraph, he says : 'It is to be regretted, however, that the science of medicine, like other things, has been made a subject upon which many false doctrines and hypotheses have been promulgated; because not only is our health, but our lives, put in jeopardy, by the honest belief in an untrue hypothesis, by a practising physician.' We presume the learned writer in this puerile sentence meant to tell us that physicians often jeopardize the health and lives of their patients by improper treatment, when they adopt wrong notions concerning their diseases.    It is a great pity our writer did not give us a brief history of a few cases which must have fallen under his personal observation, and which would have afforded an ample illustration of this fact.    We think, if we are not mistaken, he might have told us of one in which, from a misapprehension of the nature of an injury done to an arm, a dislocation of the elbow was left by the surgeon unreduced, and the poor patient subjected for life to a useless state of the joint.    It is probable he might likewise have related another, where the physician, through his ignorance of the case, permitted a malignant disease of the eyelid to progress from a state in which it could have been removed by a safe and trifling operation, to one in which it is to be feared the whole eye must be extirpated, or the sufferer destroyed.    If these two cases had been thought not enough to have established the fact, it is possible he might have given us an instance of a dislocation at the shoulder, in which a few wrong notions of the surgeon cost the patient his life." Besides the introductory matter above alluded to, the plaintiff also stated, that previous to the publication of the libel, he attended a consultation with one Doctor Cummings, in the case of a man of the name of *Pierson*, who had a dislocated shoulder; that they, the surgeons, proposed to reduce the dislocation, but Pierson would not consent; that Cummings proposed to bribe Pierson to give his consent by offering him some whisky, saying that he could hire him with a glass of whiskey to give his consent; that the plaintiff protested against such proceeding, and left Pierson; that in about two hours afterwards he and Cummings returned, and found Pierson greatly intoxicated, whiskey

CASES IN THE SUPREME COURT

having been given to him in their absence; that they then
reduced the dislocation, and the plaintiff proposed to give
Pierson an emetic to relieve his stomach from the whiskey,
but Cummings objected and they departed. On the next
day the plaintiff was called upon to visit Pierson, and found
him in the agonies of death, and shortly thereafter he died.
The plaintiff also stated, that previous to the publication of
the libel he was consulted by a Mrs. Edwards, as to some
warts on one of her .eye-lids; that he examined the eye-lid,
and told her the warts might be easily removed, but that
she probably would suffer no inconvenience from them;
that several years afterwards his attention was again called
to the disease of the eye-lid of Mrs. Edwards, and he then
found that it was assuming a malignant character; where-
upon he advised her to proceed without delay to Philadel-
phia, and consult an eminent surgeon residing there. The
plaintiff also stated, that previous to the publication of the
libel, he was called upon to visit one Ira Satterly, who had
an injured elbow; that he found the arm greatly swollen;
that he prescribed remedies to reduce the inflammation, so
that the right arm might be examined; that he then departed,
and was not afterwards called upon to visit Satterly. The
plaintiff accompanied the setting forth of the libel with va-
rious *innuendoes*. He alleged by way of *innuendo*, that the
defendant, in using the terms *a celebrated surgeon of whis-
key memory*, meant him, the plaintiff, and intended to insin-
uate that he had been guilty of mal-practice in administering
whiskey to Pierson, whereby the latter lost his life; that by
the term *steam doctor*, he meant ironically to designate and
describe the plaintiff, and to cause it to be believed that he
was the writer of the article M. B.; and that in expressing
his regret in the libel that the writer of M. B. had not given
a brief history of a few cases which must have fallen under
his personal observation, he meant the cases of *Pierson*,
*Satterly* and *Edwards*, set forth in the introductory part of
the count; and that by the specifications of the injury to an
arm, the disease of the eye-lid, and the dislocation of the
shoulder, the defendant meant and intended to allude and
refer to the said respective cases, and to charge the plaintiff

ALBANY,
Oct. 1836.

Miller
v.
Maxwell.

with ignorance, unskilfulness and mal-practice in his profession of a physician and surgeon, and thus jeopardizing the health and lives of his patients. The *second*, *third* and *seventh* counts of the declaration are substantially like the first count. A *nolle prosequi* was entered to the fourth, fifth and sixth counts. The *eighth*, *ninth*, and *tenth* counts are substantially alike, and are based upon the same publication counted upon as a libel set forth in the first count. In those counts the plaintiff does not allege that the defendant had declared him to be the writer of the article M. B., but virtually admits that the article was written by some other person designated by the defendant as a *noted steam doctor :* but he alleges that by the appellations *surgeon of whiskey memory*, and *surgeon* and *physician*, instances of whose ignorance and mal-practice are given in the libel, the defendant meant the plaintiff; and that by the cases alluded to in the libel, he meant *the cases specified in the introductory part of the declaration.*

The defendant pleaded, 1. The *general issue to all the counts* left upon the record after the entry of a *nolle prosequi* to the fourth, fifth, and sixth counts; 2. As to so much of the first, second, third and seventh counts as sets forth that portion of the libel in which the defendant expresses his conjectures as to the probable author of the article M. B., viz. that he first supposed it to be written by a *celebrated surgeon of whiskey memory*, but on a second perusal concluded it was from the pen of a *noted steam doctor*, the defendant pleaded the general issue, and as to the residue of those counts *actio non*, because the plaintiff *was not the author or writer of the article signed M. B. ;* and 3. As to the eighth, ninth and tenth counts, he pleaded that as to so much of those counts as sets forth that portion of the libel in which the defendant expresses his conjectures that the article M. B. was written by a celebrated surgeon of whiskey memory, he was not guilty *in modo et forma*, and as to the residue of those counts *actio non*, because the plaintiff *was not the author or writer of the article signed M. B.;* concluding each special plea with a verification. To those

special pleas the plaintiff interposed a *general demurrer*, and the defendant joined in demurrer.

*S. Stevens,* for the plaintiff, insisted that the special pleas did not answer the whole declaration, and were therefore bad. That the several counts of the declaration were good, but whether so or not, that the defendant having pleaded the *general issue* to the whole declaration, was not at liberty on a demurrer to his *special pleas,* to raise any objection to the declaration, according to the case of *Wheeler* v. *Curtis,* 11 Wendell, 653.

*D. Cady,* for defendant, insisted that a good and perfect answer was given to the several counts of the declaration by the special pleas ; but if not, that the declaration was wholly defective ; and he submitted whether the court would apply the rule intimated in the case of *Wheeler* v. *Curtis* to a case where it is manifest that the declaration is so defective that in case of a verdict in favor of the plaintiff the judgment must be *arrested,* or *reversed* on writ of error.

*By the Court,* NELSON, Ch. J. It is manifest, from a perusal of the libel in question, that there are no expressions contained in it, so far designating the plaintiff, as to enable any one reading it to apply to him the slanderous imputations. The author or writer of the article signed M. B., previously published, is directly referred to, and is the person whose practice as a physician and surgeon is upon the face of the publication impeached. There would seem to be no great difficulty in maintaining the action on the part of the plaintiff or any other person who could prove himself the author of that article. The declaration, however, expressly disaffirms the authorship of the plaintiff, and seeks to sustain the action upon the assumption that the plaintiff was attacked under the assumed name of the author ; in other words, that the defendant, while assailing the professional character of the author of that article, intended the plaintiff. It is not pretended that there is any thing in the expressions used indicating such intent ; but the allega-

tion is put forth by way of inducement in the declaration. In addition to this allegation, the history of the cases of three patients professionally visited by the plaintiff are given in the introductory part of the declaration, which it is supposed were referred to in the libel, followed by the usual *colloquium* and *innuendoes*. Whether these averments are sufficient to make the publication in question a libel upon the plaintiff, which does not appear to be one on the face of it, is a material point in the case.

The doctrine involved in this point is most lucidly and satisfactorily stated by Chief Justice De Grey who delivered the unanimous opinion of all the judges in the house of lords, in the case of *The King* v. *Horne,* Cowper, 682; his opinion in that case has been frequently referred to as of the highest authority ever since. That was an information against the defendant for publishing a libel; and the question presented was, whether the writing described in the information was sufficiently stated to make it a libel upon the government. The chief justice, after commenting upon the degree of certainty required, observed, "It may happen that a writing may be so expressed, and in such clear and unambiguous words, as that it may amount of itself to a libel. In such a case, the court wants no circumstances to make it clearer than it is of itself; but if the terms of the writing are general or ironical, or spoken by way of allusion or reference, although every man who reads such a writing may put the same construction upon it, it is by understanding something not expressed in direct words, and it being a matter of crime, and the party liable to be punished for it, there wants something more. It ought to receive a judicial sense whether the application is just, and the fact or nature of the fact on which that depends is to be determined by a jury." This exposition of the law was referred to and approved in the case of *Van Vechten* v. *Hopkins,* 5 Johns. R. 221.

The same principles are perhaps more fully stated by Baron Alexander, in delivering the opinion of the judges in the case of *Hall* v. *Blandy,* 1 Young & Jervis, 480, in the court of exchequer. He observes, where that which is

termed a libel does not necessarily upon the face of it impute one, it is required to connect it with certain facts by way of inducement, in order that so explained it may amount to a libel, and that there may be sufficient certainty, that what is therein stated relates to the plaintiff in the action. If the plaintiff is referred to by name, that is sufficient. The same learned judge goes on; "It may be necessary to state in the introductory part of the declaration, 1. The extrinsic circumstances and facts by which the words become actionable; 2. That the words relate to these facts, by laying a colloquium; and 3. Connecting averments, called innuendoes, by which such parts of the publication as want explanation are referred to the introductory facts. By this processs, the extrinsic facts incorporated as it were into the defendant's publication, become an integral part of the plaintiff's case, and the whole forms one entire slanderous charge upon the face of the record."

From these rules of pleading, as well as from the nature of the action itself, it is obvious that the publication must describe the plaintiff with sufficient certainty to enable his personal acquaintances, on reading it, to apply to him the slanderous imputations; if not, however gross the charges, it is no libel upon him—no more than a libel published in a foreign language, which is not actionable unless it is averred that the hearers understood it. Cro. El. 496, 865. 2 Saund. Pl. & Ev. 795. When the words are obscure and equivocal, and do not *per se* import slanderous imputations, or point them to the plaintiff, and therefore require explanation by reference to extrinsic matters, such explanation is not for the purpose of showing the intent of the defendant to calumniate the plaintiff, because that alone would do him no harm, but to show that he had accomplished such intent; that the words as used and understood by the hearers fixed upon him the charges. Then, though he is not expressly designated (which of itself would be sufficient) with the aid of the extrinsic matter, the libel becomes certain as to the individual intended, and its publication equally injurious to his character. In the language of Baron Alexander, the extrinsic facts become incorporated into the

ALBANY,
Oct. 1836.

Miller
v.
Maxwell.

defendant's publication, are an integral part of the plaintiff's case and the whole forms one entire slanderous charge. In the case of *Goldstein* v. *Foss and another*, 4 Bing. 489, the libel consisted of a letter addressed to the members of a certain society for the protection of trade against swind-lers and sharpers by their secretary, in which the plaintiff was designated as one who was reported to the society as *improper* to become a member : *innuendo*, that the plaintiff was a swindler and sharper. After verdict for the plaintiff, the judgment was arrested; upon the ground that there were not facts enough upon the record to show that the construc-tion put upon the libellous words by the *innuendo* was the sense in which they were employed by the defendant. The words did not import that the plaintiff was a swindler, and an allegation of some fact was required to prove they were used in that sense. If, says Best, Ch. J., the declaration had gone on to aver that it was the custom of the society to designate swindlers by the term *improper persons*, the *innuendo* might have been sufficient. The learned chief jus-tice no doubt intended a custom of the society known to the public—at all events, known to the members of the soci-ety ; and then such persons reading the letter would under-stand the term; and as imputing the character given by the *innuendo*.

This part of the case may be further illustrated by the libel under consideration. After referring to the article, M. B., the writer, says " At first we supposed it was writ-ten by a celebrated surgeon of whiskey memory ; but on our second perusal, we changed our opinion, and concluded it was from the pen of a noted steam doctor." The plaintiff has set out, by way of *innuendo*, that *he* was intended by the terms *surgeon of whiskey memory*, and *steam doctor.* Now, an *innuendo* may apply what is already expressed; but cannot add to, enlarge or change the sense of the pre-vious words. 1 Saund. 243, n. 2 Salk. 513. 9 East, 93. 2 Saund. Pl. and Ev. 799. 5 Johns. R. 221. De Grey, Ch. J. in *The King* v. *Horne*, p. 684, says it is only used as a word of explanation; it cannot extend *the sense of the ex-*

*pressions beyond their own meaning, unless something is put upon the record for it to explain.* In this case, I am unable to find any thing upon the record, any introductory matter, authorizing or warranting the inference drawn, that the words above used meant the plaintiff. It will not be pretended that he is designated by their common and natural meaning ; and if not, for aught that appears in the declaration, they may apply to any one else as well as to him. This plain and natural meaning cannot be varied by the *innuendo*, unless there is some previous fact or circumstance alleged which, in connection with the terms, fix the meaning imputed to them. If, in the introductory part of the declaration, it had been averred that the plaintiff was known in the community by the names of the "surgeon of whiskey memory," or "steam doctor," or that the defendant had been in the habit of giving him these appellations in his neighborhood or among his associates, by reason of which he was thus known, then the innuendo in connection with such averments would be warranted ; and supposing the facts to be proved, would establish a case showing the plaintiff libelled under those names. When referred to by these appellations, he would be as well known by his acquaintances as if his proper name had been used ; and if libelled under either, or both of them, they would readily understand the person intended. The true question in cases of this kind was put to the jury by Chief Justice Abbot, in *Bourke* v. *Warren*, 2 Carr. & Payn, 307. "The question for your consideration," he said, "is whether you think the libel designates the plaintiff in such a way as to let those who knew him understand that he was the person meant. It is not necessary that all the world should understand the libel ; it is sufficient if those who knew the plaintiff can make out that he is the person meant." See also *Fisher* v. *Clement*, 10 Barn. & Cres. 472. From the foregoing view of the law, it is manifest the introductory averment in the first count, that the defendant falsely stated and declared that the plaintiff was the author of the article signed M. B. cannot help out the want of certainty in the libel as to the person intended. It may show that the defendant had the

plaintiff in view when he wrote it, and that he intended to libel him; but it by no means shows that he carried into complete effect such intent. The intent of the defendant or of the publication is material only when connected with the tendency of the libel, and that must be such as clearly to import injurious imputations upon the character of the plaintiff. 10 Barn. & Cres. 119. I do not say but that if the defendant had given out that the plaintiff was the author of the article signed M. B., and that fact was thus known and understood in the community, and the defendant afterwards libelled the plaintiff under that appellation, the plaintiff might have so declared as to maintain the action. No such case however is presented, and an opinion is not called for on the point.

Again; the attempt to show that the plaintiff was the person intended by the libel, by means of the history of the cases of the three patients, set forth as introductory matter in the declaration, is equally as unsatisfactory as the one just examined. I am not sure these cases were given for the purpose of identifying the plaintiff as the person calumniated, but rather with a view of proving the publication itself libellous. The plaintiff, however, has a right to use them in either or both aspects of the case. There is nothing in this introductory matter, together with the *innuendoes,* tending to show that the *person* of either of these patients was described in the libel, or by which any one reading it could understand they were alluded to—no name, locality, or circumstance of the remotest bearing, affording a clue to the individuals who had suffered under " wrong notions concerning their diseases." The certainty with which they are supposed to be designated, turns exclusively upon the alleged identity of the diseases, or ailments. The cases mentioned in the publication are, 1. An injured arm, a dislocation of the elbow left unreduced so long that the use of the joint was lost ; 2. A malignant disease of the eye-lid, which might at first have been removed by a trifling operation, but was left till it was feared the whole eye must be extirpated ; 3. A dislocation of the shoulder, by which the patient lost his life. *Satterly,* a patient of the plaintiff, who

ALBANY,
Oct. 1836.

Miller
v.
Maxwell.

'had an injured arm, supposed to be referred to as one of ·the cases, does not appear to have had a dislocation of the elbow ·nor a useless joint. The only identity in the two cases ·is," that ·each had an ·injured arm. The rest of the description in the ·libel is not common to both, and therefore tends to disprove the identity. In respect to *Pierson,* who had the dislocated shoulder, he was not the patient of the plaintiff, but of a Doctor Cummings; and as to Mrs. 'Edwards, it does not appear that she was the plaintiff's patient, or that the plaintiff had been -called to examine, professionally, the blemish upon her eye-lid. Now the plaintiff supposes he has been libelled in his professional character in respect to his attendance and services in these three cases ; and he asks the court to infer this from the resemblance between them and the cases mentioned ·in the publication. But in order to lay a plausible foundation for this conclusion, it would seem that the plaintiff should show at least they were his patients, and' that he was responsible for the prescriptions and treatment. What good reason has he to suspect that he was alluded to, professionally, through. the medium of these cases, upon reading the publication. if in ·fact cases of patients are ₁ described who were not under his care ? I do not, however, deem it important ·to pursue this course of observation, because if the cases as described in the introductory part of the declaration and' the libel were identical, they would fall far short of pointing out the plaintiff with the certainty required, or fixing upon the publication a defamatory character. 'Hundreds of physicians and surgeons may have had cases, in the course of their professional services, corresponding as closely with those described in the libel as the above. A dislocated *elbow,* or shoulder, or disease of the eye-lid, are not of uncommon occurrence. So long as the identity rests entirely in the description of the cases, without in some way designating the individual patient, it. will be illusory and inconclusive. Judge Van Ness, in delivering the opinion of the court in *Van Vechten* v. *Hopkins,* concedes that cases exist in which the words in themselves were held to be so vague and uncertain as that it could not be intended they

ALBANY,
Oct. 1836.

Miller
v.
Maxwell.

were spoken of any person, and that for that reason they could not be made actionable by an averment. One of the cases referred to may be found in Cro. Eliz. 496, where the charge was, " my enemy (meaning the plaintiff) is an extortioner." Though the words were alleged to have been spoken of the plaintiff, the court say it is not material, for it could not appear so to those that heard them. Sir John Bourne's case is there referred to, where three persons were witnesses against him, and he said " One of you is perjured," and it was adjudged no action could be sustained. In *James* v. *Ruttich*, 4 Rep. 17, it was resolved two things were requisite in every action of slander: 1. That the person who is scandalized is certain; 2. That the scandal is apparent by the words themselves. Several examples of uncertainty are then given. See also 1 Viner, 507. Judge Van Ness distinguished between these cases and the one then under consideration, where the words in themselves amounted to a libellous charge upon some particular person, but where that person was so ambiguously described, as that without the aid of extrinsic facts, his identity could not be ascertained, but where by the introduction of proper averments and a *colloquium*, the words might, notwithstanding, be rendered sufficiently certain to maintain an action. We have before made all the observations on this part of the case deemed necessary. See also the opinion of Mr. Justice Spencer in the same case, p. 228.

The above view of this case, though confined chiefly to the first count, is equally applicable to the second, third and seventh counts. The eighth, ninth and tenth counts are somewhat differently constructed and require a brief consideration. In these counts the plaintiff does not insist that he was alluded to as the author of the article signed M. B. ; but concedes that a *steam doctor* was the author, agreeably to the charge in the libel. He however insists, that he was alluded to by the expression *surgeon of whiskey memory*, and that he was the *physician and surgeon* alluded to and intended by the defendant, and that his three cases were those described as having fallen under the observation of the author of the article signed M. B. ; by reason of all

which he was defamed in his professional character of physician and surgeon. Now, as before observed in the examination of the other class of counts, there is nothing upon the record authorizing the inference, that the plaintiff was alluded to by the expression *surgeon of whiskey memory.* Such is not the natural meaning of the terms, and the *innuendo* cannot enlarge or alter it, unless there is some matter set forth showing that such expressions are understood in the community, or by the plaintiff's acquaintances, to refer to him. The pleader in the *innuendo* avers, that the defendant meant and intended by this expression to have it understood that the plaintiff was guilty of mal-practice, in the aforesaid case of Pierson, by administering whiskey to him, and that the memory of such mal-practice rested in the minds of the citizens of the neighborhood. But we find nothing in the libel or intrinsic facts set forth to warrant this conclusion; nothing by which it appears that the neighborhood could understand the meaning thus imputed to the expressions. It is not even averred, in the introductory part of the declaration, that whiskey was administered by the plaintiff to Pierson; but on the contrary, that it was done in his absence and against his advice; or what is more material, it is not averred that he had acquired in the neighborhood the cognomen here given. How could the readers or hearers of the libel understand the plaintiff was alluded to, if no such appellation had attached to him, and it was given in the libel for the first time? The error of the pleader is, in supposing it to be enough to entitle the plaintiff to maintain the action, that the defendant *intended* to libel him. We have before endeavored to show that this is a mistake. The tendency of the libel must be such that persons reading it will receive an impression injurious to his character; whatever may be the intent, if such is not the effect of the publication, it is not libellous. These observations are equally applicable to the *innuendo* that the plaintiff was the *surgeon and physician* alluded to and intended by the defendant in the libel. The only extrinsic facts set forth which can be supposed to warrant this meaning, are the cases of the three patients described in the introductory

part of the first count. Physician and surgeon, used in the libel, are general terms, and of themselves have no more allusion to the plaintiff than to any other member of the profession. Something more, therefore, is requisite to designate him; the history of these three patients is relied on, and that they are those particularly described in the publication. I have already made all the remarks on this point which I think necessary.

Upon the whole, the great and radical defect in all these counts is, that assuming every fact stated in them to be proved, the plaintiff does not show that he has been libelled. He is not alluded to by name, and the extrinsic facts and circumstances stated to warrant the conclusion that he was the person referred to under the terms *surgeon of whiskey memory, steam doctor, physician and surgeon*, or *author of the article M. B.*, are wholly insufficient. With the aid of all this introductory matter, neither count presents a case showing to the court that any person reading the libel could thus understand the expressions. Without this, no injurious impression could be made upon his mind respecting the character of the plaintiff, professional or otherwise; the publication cannot, therefore, be a libel upon him.

The special pleas are defective, and constitute no legal defence to the several counts to which they are put in. The plaintiff did not seek to maintain the action in either of them upon the ground that he was the author of the article signed M. B.; on the contrary, each count, either expressly or impliedly concedes that he was not. It was no answer, therefore, to say that he was not the author. The pleas presented no issue for trial, and left undefended the *gravamen* of the counts.

Under the rule laid down in *Wheeler* v. *Curtis*, 11 Wendell, 653, it was urged that the defendant here having pleaded the general issue to all the counts, could not go back and object to the declaration. Such an opinion was expressed by me, though it was not material to the decision of that case; the principle, however, has since been followed. It is well settled that a defendant cannot both plead and demur to the same count. The one may be a denial of the

ALBANY,
Oct. 1836.

Miller
v.
Maxwell.

facts, the other is an admission of them, and a question of law is raised and referred to the court whether the plaintiff has shown a cause of action. The one issue is determined by a jury, and the other by the court. Now it seems to be inconsistent for the court to maintain the above rule, and at the same time permit the defendant indirectly to evade it. This he certainly may do, under the rule contended for, by first pleading the general issue, and then a defective special plea to the same count ; for on a demurrer to the plea, the defendant may go back to the count and avail himself of every objection that could be made to it on a general demurrer. He thus has the benefit of the general issue, and of a general demurrer to the same count—a violation of one of the first rules of pleading. I am aware of the reason given for this indirect use of the demurrer to the plea, namely, that it is convenient, and a saving of time and expense, thus summarily to test the goodness of the count ; otherwise the defendant, after trial, would be driven to a writ of error, or motion in arrest of judgment. Undoubtedly there is much force in this consideration, and if the rule should be confined to such cases and such only, though inconsistent with a fundamental rule of pleading, it would be unobjectionable ; but when extended to all cases of substantial defects in the pleading which may be reached by general demurrer, a large class are embraced that are cured by the verdict, both at common law and by the statute of amendments. When there is upon the record a plea to the count raising an issue to be tried by the jury, and the count is sufficient to sustain the verdict for the plaintiff after judgment, there is not the slightest reason of convenience or justice, for permitting it to be thus indirectly attacked. If the party wished to avail himself of these defects, he should have demurred in the first instance. If he chooses to plead, good sense and fair practice require no objection should be permitted to the declaration which a verdict would cure. Convenience and economy of time and expense may, and I think will, justify the departure from the settled rule, that a plea and demurer cannot be put in to the same count, by this indirect practice, in the case of defects not cured by

the verdict. The rule therefore, as stated in *Wheeler* v. *Curtis*, should have been accompanied with this qualification.